**Slip Op. 01-76**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS
_____
                                        :
NTN BEARING CORPORATION OF AMERICA and  :
NTN KUGELLAGERFABRIK (DEUTSCHLAND) GmbH; :
SKF USA INC. and SKF GmbH;              :
FAG KUGELFISCHER GEORG SCHAFER AG and   :
FAG BEARINGS CORPORATION,               :
                                        :
            Plaintiffs and              :
            Defendant-Intervenors,      :
                                        :
            and                         :
                                        :
INA WALZLAGER SCHAEFFLER oHG and        :
INA BEARING COMPANY, INC.,              :
                                        :
            Plaintiffs,                 :
                                        :
        v.                              :   Consol. Court No.
                                        :   97-10-01800
UNITED STATES,                          :
                                        :
            Defendant,                  :
                                        :
            and                         :
                                        :
THE TORRINGTON COMPANY,                 :
                                        :
            Defendant-Intervenor        :
            and Plaintiff.              :
_____:

        Plaintiffs and defendant-intervenors NTN Bearing Corporation
of America, NTN Kugellagerfabrik (Deutschland) GmbH (collectively
"NTN"), SKF USA Inc., SKF GmbH (collectively "SKF"), FAG
Kugelfischer Georg Schafer AG, FAG Bearings Corporation
(collectively "FAG"), and plaintiffs INA Walzlager Schaeffler oHG
and INA Bearing Company, Inc. (collectively "INA") move pursuant to
USCIT R. 56.2 for judgment upon the agency record challenging
various aspects of the Department of Commerce, International Trade
Administration's ("Commerce") final determination, entitled
<u>Antifriction Bearings (Other Than Tapered Roller Bearings) and
Parts Thereof From France, Germany, Italy, Japan, Romania,
Singapore, Sweden and the United Kingdom; Final Results of
Antidumping Duty Administrative Reviews</u> ("<u>Final Results</u>"), 62 Fed.

Reg. 54,043 (Oct. 17, 1997), as amended, <u>Antifriction Bearings</u>
<u>(Other Than Tapered Roller Bearings) and Parts Thereof From France,</u>
<u>Germany, Italy, Japan, Romania, Singapore[,] Sweden and the United</u>
<u>Kingdom; Amended Final Results of Antidumping Duty Administrative</u>
<u>Reviews</u>, 62 Fed. Reg. 61,963 (Nov. 20, 1997). Defendant-intervenor
and plaintiff, The Torrington Company ("Torrington"), also moves
pursuant to USCIT R. 56.2 for judgment upon the agency record
challenging certain determinations of Commerce's <u>Final Results</u>.

Specifically, NTN contends that Commerce unlawfully: (1)
denied a price-based level of trade ("LOT") adjustment to normal
value ("NV") for its constructed export price ("CEP") sales; (2)
refused to calculate CEP profit on an LOT-specific basis; (3)
conducted a duty-absorption inquiry under 19 U.S.C. § 1675(a)(4)
(1994) for the subject reviews of the applicable antidumping duty
orders covering antifriction bearings ("AFBs") from Germany; (4)
determined that it applied a reasonable duty-absorption methodology
and that duty absorption had in fact occurred; and (5) denied a
downward adjustment to NTN's reported United States indirect
selling expenses for imputed interests incurred in financing cash
deposits for antidumping duties.

SKF contends that Commerce unlawfully: (1) conducted a duty-
absorption inquiry under 19 U.S.C. § 1675(a)(4) for the subject
reviews of the applicable antidumping duty orders covering AFBs
from Germany; (2) determined that it applied a reasonable duty-
absorption methodology and that duty-absorption had in fact
occurred; and (3) calculated constructed value ("CV") profit.

FAG contends that Commerce unlawfully: (1) calculated CV
profit; (2) failed to match United States sales to "similar" home-
market sales prior to resorting to CV when all home-market sales of
identical merchandise have been disregarded; (3) conducted a duty-
absorption inquiry under 19 U.S.C. § 1675(a)(4) for the subject
reviews of the applicable antidumping duty orders covering AFBs
from Germany; (4) determined that it applied a reasonable duty-
absorption methodology and that duty absorption had in fact
occurred; and (5) treated certain direct selling expenses as
indirect selling expenses.

INA contends that Commerce unlawfully: (1) refused to deduct
downward billing adjustments on INA's home-market sales; (2)
failed to match United States sales to "similar" home-market sales
prior to resorting to CV when all home-market sales of identical
merchandise have been disregarded; (3) calculated CV profit; (4)
failed to exclude sales made out of the ordinary course of trade

from the home-market database; (5) included its zero-priced United States transactions in the margin calculations; (6) excluded zero-priced home-market sample transactions but not home-market sample sales; (7) calculated a single weighted-average CEP profit rate for each class or kind of merchandise; (8) excluded amounts for imputed credit and inventory carrying expenses in its calculation of total expenses for the CEP profit ratio; and (9) conducted a duty-absorption inquiry under 19 U.S.C. § 1675(a)(4) for the subject reviews of the applicable antidumping duty orders covering AFBs from Germany.

Torrington contends that Commerce unlawfully: (1) accepted SKF's home-market support rebates; (2) accepted SKF's home-market billing adjustments; and (3) accepted FAG's home-market rebates.

**Held:** NTN's, SKF's, FAG's and INA's USCIT R. 56.2 motions are granted in part and denied in part. Torrington's USCIT R. 56.2 motion is denied. This case is remanded to Commerce to: (1) annul all findings and conclusions made pursuant to the duty-absorption inquiry conducted for the subject review in accordance with this opinion; (2) attempt to match United States sales to similar home-market sales before resorting to CV; (3) reconsider its determination to deny a downward billing adjustment to INA on its home-market sales; (4) clarify how it complied with the statutory framework of 19 U.S.C. §§ 1677e, 1677m (1994) for using facts available and applying an adverse inference and if it determines it did not adhere to all of the statutory prerequisite conditions, to give INA the opportunity to remedy or explain any deficiency regarding its alleged sample sales; and (5) include all expenses included in "total United States expenses" in the calculation of "total expenses" for INA.

[NTN's, SKF's, FAG's and INA's USCIT R. 56.2 motions are granted in part and denied in part. Torrington's USCIT R. 56.2 motion is denied. Case remanded.]

Dated: June 22, 2001

Barnes, Richardson & Colburn (Donald J. Unger, Kazumune V. Kano and Christine H.T. Yang) for NTN.

Steptoe & Johnson LLP (Herbert C. Shelley and Alice A. Kipel) for SKF.

Grunfeld, Desiderio, Lebowitz & Silverman LLP (Max F. Schutzman, Andrew B. Schroth and Mark E. Pardo) for FAG.

Arent Fox Kintner Plotkin & Kahn, PLLC (Stephen L. Gibson) for INA.

Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director); of counsel: Mark A. Barnett, Patrick V. Gallagher, Rina Goldenberg and David R. Mason, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart, Wesley K. Caine, Geert De Prest and Lane S. Hurewitz) for Torrington.

## OPINION

**TSOUCALAS, Senior Judge:**        Plaintiffs and defendant-intervenors NTN Bearing Corporation of America, NTN Kugellagerfabrik (Deutschland) GmbH (collectively "NTN"), SKF USA Inc., SKF GmbH (collectively "SKF"), FAG Kugelfischer Georg Schafer AG, FAG Bearings Corporation (collectively "FAG"), and plaintiffs INA Walzlager Schaeffler oHG and INA Bearing Company, Inc. (collectively "INA") move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews ("Final Results"), 62 Fed. Reg. 54,043 (Oct. 17, 1997), as amended, Antifriction Bearings (Other Than Tapered Roller Bearings) and

<u>Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore[,] Sweden and the United Kingdom; Amended Final Results of Antidumping Duty Administrative Reviews</u>, 62 Fed. Reg. 61,963 (Nov. 20, 1997). Defendant-intervenor and plaintiff, The Torrington Company ("Torrington"), also moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain determinations of Commerce's <u>Final Results</u>.

Specifically, NTN contends that Commerce unlawfully: (1) denied a price-based level of trade ("LOT") adjustment to normal value ("NV") for its constructed export price ("CEP") sales; (2) refused to calculate CEP profit on an LOT-specific basis; (3) conducted a duty-absorption inquiry under 19 U.S.C. § 1675(a)(4) (1994) for the subject reviews of the applicable antidumping duty orders covering antifriction bearings ("AFBs") from Germany; (4) determined that it applied a reasonable duty-absorption methodology and that duty absorption had in fact occurred; and (5) denied a downward adjustment to NTN's reported United States indirect selling expenses for imputed interests incurred in financing cash deposits for antidumping duties.

SKF contends that Commerce unlawfully: (1) conducted a duty-absorption inquiry under 19 U.S.C. § 1675(a)(4) for the subject reviews of the applicable antidumping duty orders covering AFBs from Germany; (2) determined that it applied a reasonable duty-

absorption methodology and that duty absorption had in fact occurred; and (3) calculated constructed value ("CV") profit.

FAG contends that Commerce unlawfully: (1) calculated CV profit; (2) failed to match United States sales to "similar" home-market sales prior to resorting to CV when all home-market sales of identical merchandise have been disregarded; (3) conducted a duty-absorption inquiry under 19 U.S.C. § 1675(a)(4) for the subject reviews of the applicable antidumping duty orders covering AFBs from Germany; (4) determined that it applied a reasonable duty-absorption methodology and that duty absorption had in fact occurred; and (5) treated certain direct selling expenses as indirect selling expenses.

INA contends that Commerce unlawfully: (1) refused to deduct downward billing adjustments on INA's home-market sales; (2) failed to match United States sales to "similar" home-market sales prior to resorting to CV when all home-market sales of identical merchandise have been disregarded; (3) calculated CV profit; (4) failed to exclude sales made out of the ordinary course of trade from the home-market database; (5) included its zero-priced United States transactions in the margin calculations; (6) excluded zero-priced home-market sample transactions but not home-market sample sales; (7) calculated a single weighted-average CEP profit rate for each class or kind of merchandise; (8) excluded amounts for imputed

credit and inventory carrying expenses in its calculation of total expenses for the CEP profit ratio; and (9) conducted a duty-absorption inquiry under 19 U.S.C. § 1675(a)(4) for the subject reviews of the applicable antidumping duty orders covering AFBs from Germany.

Torrington contends that Commerce unlawfully: (1) accepted SKF's home-market support rebates; (2) accepted SKF's home-market billing adjustments; and (3) accepted FAG's home-market rebates.

### BACKGROUND

This case concerns the seventh administrative review of the antidumping duty order on AFBs from Germany for the period of review ("POR") covering May 1, 1995 through April 30, 1996. On June 10, 1997, Commerce published the preliminary results of the seventh review. See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews ("Preliminary Results"), 62 Fed. Reg. 31,566. Commerce published the Final Results on October 17, 1997, see 62 Fed. Reg. at 54,043, and the Amended Final Results on November 20, 1997, see 62 Fed. Reg. at 61,963.

Since the administrative review at issue was initiated after December 31, 1994, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective January 1, 1995). See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA amendments)).

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

## STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in an antidumping administrative review, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994); see NTN Bearing Corp. of Am. v. United States, 24 CIT ___, ___, 104 F. Supp. 2d 110, 115-16 (2000) (detailing Court's standard of review for antidumping proceedings).

## DISCUSSION

### I.   Denial of a Price-based LOT Adjustment to NV (NTN)

NTN contends that Commerce improperly denied a price-based LOT adjustment for CEP sales made in the United States market at an LOT different from the home-market sales.[1]  See NTN's Mem. Supp. Mot. J. Agency R. ("NTN's Mem.") at 7.  In particular, NTN argues, inter alia, that Commerce incorrectly determined NTN's CEP LOT because the agency failed to use the sale to the first unaffiliated purchaser in the United States to determine NTN's CEP LOT.  See id. NTN requests that the Court remand the LOT issue to Commerce to grant NTN a price-based LOT adjustment for its CEP sales.  See id. at 9.

Commerce, in turn, argues that it properly determined the LOT for NTN's CEP sales after deducting expenses and profit from the price to the first unaffiliated purchaser in the United States pursuant to § 1677a(d) because § 1677b(a)(7)(A), which provides for an LOT adjustment, requires Commerce to compare CEP, not the "unadjusted" starting price of CEP, with NV.  See Def.'s Mem. in Partial Opp'n to Pls.' Mots. J. Agency R. ("Def.'s Mem.") at 92-93. Commerce notes CEP is defined in § 1677a(b) as the price at which

---

[1] For a complete discussion of background information and the statutory provisions at issue, the reader is referred to this Court's decision in  NTN Bearing Corp. of Am., 24 CIT at ___, 104 F. Supp. 2d at 125-128.

the subject merchandise is first sold (or agreed to be sold) in the United States as "adjusted" under § 1677a(d).  See id. at 93. According to Commerce, the adjusted CEP price is to be compared to prices in the home market based on the same LOT whenever it is practicable; when it is not practicable and the LOT difference affects price comparability, Commerce makes an LOT adjustment.  See id. at 94.  Commerce makes a CEP offset when Commerce is not able to quantify price differences between the CEP LOT and the LOT of the comparison sales, and if NV is established at a more advanced state of distribution than the CEP LOT.  See id.  If the CEP price is not adjusted before it is compared under the approach advocated by NTN, "there will always be substantial deductions from the resale prices in the United States (because they are mandatory)," but they "will be compared to resale prices in the home market from which virtually [there will] never be any equivalent deductions," thus creating a substantial imbalance and a skewed comparison between NV and CEP.  Id. at 95 (emphasis in the original).

Commerce claims that it properly denied an LOT adjustment for NTN's CEP sales because NTN failed to establish its entitlement to an LOT adjustment.  Commerce was unable to calculate an LOT adjustment because "NTN did not have a level of trade equivalent to the CEP level of trade in the home market," making it impossible to quantify the difference in price between the CEP LOT and the home-

market LOT. Id. at 104-05. Commerce maintains that the Court should uphold its refusal to grant to NTN an LOT adjustment. See id. at 105.

Torrington generally agrees with Commerce's positions, emphasizing that: (1) Commerce correctly made § 1677a(d) adjustments to the starting price of CEP prior to determining an LOT for NTN's CEP sales; and (2) properly denied an LOT adjustment for NTN's CEP sales. See Torrington's Resp. to Pls.' Mots. J. Agency R. ("Torrington's Resp.") at 32. Accordingly, Torrington contends that this Court should not disturb Commerce's reasonable interpretation of the statute as applied to the record evidence.

In Micron Tech., Inc. v. United States, 243 F.3d 1301 (Fed. Cir. 2001), the Court of Appeals for the Federal Circuit ("CAFC") held that the plain text of the antidumping statute and the Statement of Administrative Action ("SAA")[2] require Commerce to

---

[2] The Statement of Administrative Action ("SAA") represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements." H.R. Doc. 103-316, at 656 (1994), reprinted in 1994 U.S.C.C.A.N. 4040. "It is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." Id.; see also 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

deduct the expenses enumerated under § 1677a(d) before making the LOT comparison.[3]  The court examined §1677b(a)(1)(B)(i), which provides that Commerce must establish NV "to the extent practicable, at the same level of trade as the export price or [CEP]," and § 1677a(b), which defines CEP as "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States . . . <u>as adjusted under subsections (c) and (d) of this section</u>." (Emphasis supplied).  The court concluded that "[r]ead together, these two provisions show that Commerce is required to deduct the subsection (d) expenses from the starting price in the United States before making the level of trade comparison."  <u>Micron Tech., Inc.</u>, 243 F.3d at 1315.  The court further stated that this conclusion is mandated by the SAA, which states that "'to the extent practicable, [Commerce should] establish [NV] based on home[-]market (or third[-]country) sales at the same level of trade as the constructed export price or the starting price for the export price.'" <u>Id.</u> (citing SAA at 829).

Thus, the Court finds that Commerce properly made § 1677a(d) adjustments to NTN's starting price in order to arrive at CEP and make its LOT determination.  The Court also finds that Commerce's

---

[3] The CAFC's decision effectively overturned the Court of International Trade's determination with respect to this issue in <u>Borden, Inc. v. United States</u>, 22 CIT 233, 4 F. Supp. 2d 1221 (1998), <u>rev'd</u> 2001 WL 312232 (Fed. Cir. Mar. 12, 2001), a case discussed by the parties in the instant matter.

decision to deny NTN an LOT adjustment is supported by substantial

evidence.  Section 1677b(a)(7)(A) permits Commerce to make an LOT

adjustment "if the difference in level of trade . . . involves the

performance of different selling activities[] and . . . is

demonstrated to affect price comparability, based on a pattern of

consistent price differences between sales at different levels of

trade in the country in which normal value is determined."  With

respect to CEP sales, Commerce found that the same LOT as that of

the CEP for merchandise under review did not exist for any

respondent in the home market; therefore, Commerce was unable to

"determine whether there was a pattern of consistent price

differences between the [LOTs] based on respondent's [home-market]

sales of merchandise under review."  See Final Results, 62 Fed.

Reg. at 54,056.

Commerce looked to alternative methods for calculating LOT

adjustments in accordance with the SAA.  See id.  In particular,

Commerce noted that the SAA states:

> "if information on the same product and company is not
> available, the [LOT] adjustment may also be based on
> sales of other products by the same company.  In the
> absence of any sales, including those in recent time
> periods, to different levels of trade by the exporter or
> producer under investigation, Commerce may further
> consider the selling expenses of other producers in the
> foreign market for the same product or other products."

Id. (quoting SAA at 830).  Commerce did not have the information

that would have supported the use of these alternative methods. See

id. Consequently, with respect to CEP sales which Commerce was unable to quantify an LOT adjustment, it granted a CEP offset to respondents, including NTN, where the home-market sales were at a more advanced LOT than the sales to the United States, in accordance with 19 U.S.C. § 1677b(a)(7)(B) (1994). See id. In sum, Commerce acted well within the directive of the statute in denying the LOT adjustment and granting a CEP offset instead. See 19 U.S.C. § 1677b(a)(7).

## II. Constructed Export Price Calculation Without Regard to LOT (NTN)

NTN contends that Commerce erred by refusing to calculate CEP profit on LOT-specific basis.[4] See NTN's Mem. at 9. Highlighting the "narrowest category of merchandise" language of § 1677a(f)(2)(C)(ii) and (iii), NTN again argues that there is a clear statutory preference that profit be calculated on the narrowest possible basis. See id. at 10. Moreover, NTN claims that since CV profit is calculated by LOT and matching is by LOT, CEP profit should be calculated to account for differences in LOT. See id. NTN asserts that the mere fact that a calculation is difficult is not a valid reason to sacrifice accuracy. See id. at 11. NTN further asserts that Commerce's speculation that an

---

[4] For a discussion of background and the relevant statutory provisions, the reader is referred to this Court's decision in NTN Bearing Corp. of Am., 24 CIT at ___, 104 F. Supp. 2d at 133-34.

adjustment is susceptible to manipulation provides no grounds for rejecting an adjustment. See id. at 12. NTN, therefore, requests that the Court remand the issue to Commerce to calculate CEP profit on an LOT-specific basis.

Commerce responds that it properly determined CEP profit without regard to LOT. See Def.'s Mem. at 105. Commerce notes, inter alia, that § 1677a(f) does not refer to LOT, that is, the statute does not require that CEP profit be calculated on an LOT-specific basis. See id. at 107. In addition, Commerce asserts that even assuming that a narrower basis for the CEP-profit calculation is warranted in some circumstances, NTN has not provided any factual support for such a deviation from Commerce's standard methodology for calculating CEP profit. See id. at 109. Torrington generally agrees with Commerce's CEP-profit calculation. See Torrington's Resp. at 32.

Section 1677a(f), as Commerce correctly notes, does not make any reference to LOT. Accordingly, the Court's duty under Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc. ("Chevron"), 467 U.S. 837 (1984) is to review the reasonableness of Commerce's statutory interpretation. See IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992) (quoting Chevron, 467 U.S. at 844).

This Court upheld Commerce's refusal to calculate CEP on an LOT-specific basis in NTN Bearing Corp. of Am., 24 CIT at ___, 104 F. Supp. 2d at 133-35, finding it to be reasonable and in accordance with law.  The Court examined the language of the statute and concluded that the statute clearly contemplates that, in general, the "narrowest category" will include the class or kind of merchandise that is within the scope of an investigation or review.  The Court based its conclusion on its examination of subsections (ii) and (iii) of § 1677a(f)(C)'s "total expense" definition.  Both subsections refer to "expenses incurred with respect to the narrowest category of merchandise . . . which includes the subject merchandise."  The term "subject merchandise" is defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921."  19 U.S.C. § 1677(25) (1994).

Accordingly, as in NTN Bearing Corp. of Am., the Court finds that Commerce reasonably interpreted § 1677a(f) in refusing to apply a narrower subcategory of merchandise such as one based on LOT.  The Court, moreover, agrees with Commerce's conclusion that a "subdivision of the CEP-profit calculation would be more susceptible to manipulation," a result that Congress specifically

warned Commerce to prevent. <u>Final Results</u>, 62 Fed. Reg. at 54,072. Finally, even if the Court were to assume that a narrower basis for calculating CEP profit would be justified under some circumstances, the Court agrees with Commerce that NTN failed to provide adequate factual support of how the CEP-profit calculation was distorted by Commerce's standard methodology.

## III. Duty-absorption Inquiry (NTN, SKF, FAG, INA)

### A. Background

Title 19, United States Code, § 1675(a)(4) provides that during an administrative review initiated two or four years after the "publication" of an antidumping duty order, Commerce, if requested by a domestic interested party, "shall determine whether antidumping duties have been absorbed by a foreign producer or exporter subject to the order if the subject merchandise is sold in the United States through an importer who is affiliated with such foreign producer or exporter." Section 1675(a)(4) further provides that Commerce shall notify the International Trade Commission ("ITC") of its findings regarding such duty absorption for the ITC to consider in conducting a five-year ("sunset") review under 19 U.S.C. § 1675(c), and the ITC will take such findings into account in determining whether material injury is likely to continue or recur if an order were revoked under § 1675(c). <u>See</u> 19 U.S.C. § 1675a(a)(1)(D) (1994).

On May 31, 1996 and July 9, 1996, Torrington requested that Commerce conduct a duty-absorption inquiry pursuant to § 1675(a)(4) with respect to various respondents, including NTN, SKF, FAG and INA, to ascertain whether antidumping duties had been absorbed during the seventh POR. See Final Results, 62 Fed. Reg. at 54,075.

In the Final Results, Commerce found that duty absorption had occurred for the POR. See id. at 54,044. In asserting authority to conduct a duty-absorption inquiry under § 1675(a)(4), Commerce first explained that for "transition orders," as defined in 19 U.S.C. § 1675(c)(6)(C) (that is, antidumping duty orders, inter alia, deemed issued on January 1, 1995), regulation 19 C.F.R. § 351.213(j) provides that Commerce "will make a duty-absorption determination, if requested, for any administrative review initiated in 1996 or 1998." Id. at 54,074. Commerce concluded that: (1) because the antidumping duty order on the AFBs in this case has been in effect since 1989, the order is a transition order pursuant to § 1675(c)(6)(C); and (2) since this review was initiated in 1996 and a request was made, Commerce had the authority to make a duty-absorption inquiry for the seventh POR. See id. at 54,075.

B.   **Contentions of the Parties**

NTN, SKF, FAG and INA contend that Commerce lacked authority

under § 1675(a)(4) to conduct a duty-absorption inquiry for the seventh POR of the outstanding 1989 antidumping duty orders. <u>See</u> NTN's Mem. at 12; SKF's Br. Supp. Mot. J. Agency R. ("SKF's Br.") at 9; FAG's Br. Supp. Mot. J. Agency R. ("FAG's Br.") at 12; INA's Br. Supp. Mot. J. Agency R. ("INA's Br.") at 46. In the alternative, the parties assert that even if Commerce possessed the authority to conduct such an inquiry, Commerce's methodology for determining duty absorption was contrary to law and, accordingly, the case should be remanded to Commerce to reconsider its methodology. <u>See</u> NTN's Mem. at 17; SKF's Br. at 16; FAG's Br. at 15.

Commerce argues that it: (1) properly construed subsections (a)(4) and (c) of § 1675 as authorizing it to make a duty-absorption inquiry for antidumping duty orders that were issued and published prior to January 1, 1995; and (2) devised and applied a reasonable methodology for determining duty absorption. <u>See</u> Def.'s Mem. at 31-47. Torrington generally agrees with Commerce's contentions. <u>See</u> Torrington's Resp. at 8-14.

**C. Analysis**

In <u>SKF USA Inc. v. United States</u>, 24 CIT ___, 94 F. Supp. 2d 1351 (2000), this Court determined that Commerce lacked statutory authority under § 1675(a)(4) to conduct a duty-absorption inquiry

for antidumping duty orders issued prior to the January 1, 1995 effective date of the URAA.  See id. at ___, 94 F. Supp. 2d at 1357-59.  The Court noted that Congress expressly prescribed in the URAA that § 1675(a)(4) "must be applied prospectively on or after January 1, 1995 for 19 U.S.C. § 1675 reviews."  Id. at ___, 94 F. Supp. 2d at 1359 (citing § 291 of the URAA).

Because Commerce's duty-absorption inquiry, its methodology and the parties' arguments are practically identical to those presented in SKF USA Inc., the Court adheres to its reasoning in SKF USA Inc.  The statutory scheme clearly provides that the inquiry must occur in the second or fourth administrative review after the publication of the antidumping duty order, not in any other review, and upon the request of a domestic interested party. Accordingly, the Court finds that Commerce did not have statutory authority to undertake a duty-absorption investigation for the antidumping duty orders in dispute here.  The Court remands this case to Commerce with instructions to annul all findings and conclusions made pursuant to the duty-absorption inquiry conducted for the subject review in accordance with this opinion.

**IV. Denial of an Adjustment to United States Indirect Selling Expenses for Interest Allegedly Incurred in Financing Cash Deposits for Antidumping Duties (NTN)**

**A.    Background**

During the review, NTN claimed a downward adjustment to its reported United States indirect selling expenses for imputed interest expenses allegedly incurred in financing cash deposits for antidumping duties.  See Final Results, 62 Fed. Reg. at 54,078. Commerce denied the adjustment and determined that such an interest offset to NTN's indirect selling expenses is inappropriate, whether based on actual interest expenses or an imputed amount allegedly associated with financing cash deposits.  See id. at 54,079. Commerce thereby deducted the entire amount of NTN's reported indirect selling expenses, including all interest, from the CEP. See id.

Commerce noted that 19 U.S.C. § 1677a(d)(1), which provides for the deduction of certain selling expenses from CEP that were "incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise," does not precisely define what constitutes a selling expense; instead, Congress has given Commerce discretionary authority to determine what such an expense encompasses.  Commerce acknowledged that in past reviews of the applicable antidumping duty orders, it determined that interest expenses incurred in

financing antidumping duty cash deposits were not considered selling expenses and thereby allowed an offsetting, financing-cost adjustment to United States indirect selling expenses, "mainly to account for the opportunity cost associated with making a deposit (i.e., the cost of having money unavailable for a period of time)." Preliminary Results, 62 Fed. Reg. at 31,569; see Final Results, 62 Fed. Reg. at 54,079. For this review, however, Commerce reconsidered its position and concluded that this offsetting financing-cost adjustment is inappropriate. See Final Results, 62 Fed. Reg. at 54,079.

Commerce found that while under the statute it may allow a limited exemption from deductions from United States price for antidumping duty cash deposits and legal fees associated with participation in an antidumping case, it found no basis for extending this exemption to interest expenses allegedly incurred in financing the cash deposits. See id. The agency reasoned that there is a distinction "between business expenses that arise from economic activities in the United States and business expenses that are direct, inevitable consequences of the dumping order." Id. Commerce determined that while cash deposits and legal fees are incurred solely as a result of the existence of an antidumping order, "[f]inancial expenses allegedly associated with cash deposits are not a direct, inevitable consequence of an antidumping

order." Id. In particular, Commerce explained that although it

may be true that some importers sometimes incur a cost if they

borrow money in order to pay for cash deposits of antidumping

duties, it is a fundamental principle that:

> 'money is fungible. If an importer acquires a loan to
> cover one operating cost, that may simply mean that it
> will not be necessary to borrow money to cover a
> different operating cost.' Companies may choose to meet
> obligations for cash deposits in a variety of ways that
> rely on existing capital resources or that require
> raising new resources through debt or equity. For
> example, companies may choose to pay deposits by using
> cash on hand, obtaining loans, increasing sales revenues,
> or raising capital through the sale of equity shares. In
> fact, companies face these choices every day regarding
> all their expenses and financial obligations. There is
> nothing inevitable about a company having to finance cash
> deposits and there is no way for [Commerce] to trace the
> motivation or use of such funds even if it were.

Id. (quoting Preliminary Results, 62 Fed. Reg. at 31,569).

Commerce also noted that "the calculation of the dumping margins

should not vary depending on whether a party has funds available to

pay cash deposits or requires additional funds in the form of

loans." Preliminary Results, 62 Fed. Reg. at 31,569.

Moreover, Commerce determined that it should not impute an

amount for any interest costs that would theoretically be

associated with financing actual cash deposits of antidumping

duties. See Final Results, 62 Fed. Reg. at 54,079. Commerce

reasoned that "there is no real opportunity cost associated with

paying cash deposits when the paying of such deposits is a

precondition for doing business in the United States.   . . .

Companies cannot choose not to pay cash deposits if they want to

import nor can they dictate the terms, conditions, or timing of

such payments." Id.


B.    Contentions of the Parties

NTN claims that Commerce's rationale for denying NTN's

adjustment for interest expenses is flawed because irrespective of

how a company opts to finance the cash deposits for antidumping

duties, the amount of cash deposited will have to be made up by

financing something else, a result that is a direct inevitable

consequence of the antidumping duty order. See NTN's Mem. at 22.

NTN also asserts that if Commerce were to allow the interest

expenses from cash deposits from prior reviews to affect the

dumping margin calculations of present reviews, a never-ending

cycle would follow that would prevent Commerce from ever revoking

the antidumping duty order. See id. at 23.


NTN also asserts that Federal-Mogul Corp. v. United States, 20

CIT 1438, 1440-41, 950 F. Supp. 1179, 1182-83 (1996), clearly

refutes Commerce's decision to deny NTN's interest-expense

adjustment. See id. at 24.  In particular, NTN notes the court in

Federal-Mogul found that there was no support for a domestic

party's "'assertion that any expense related to antidumping

proceedings is automatically a selling expense related to the sale of the subject merchandise.'" Id. (quoting Federal-Mogul Corp., 20 CIT at 1440-41, 950 F. Supp. at 1183).

Commerce argues that its decision to deny the offset was within its discretion. See Def.'s Mem. at 112. Commerce also argues that it may change its methodology if it presents a reasonable basis for departing from its previous practice. See id. Further, Commerce contends that the interest expenses allegedly incurred with financing antidumping duty cash deposits are ordinary interest expenses and, therefore, not deductible from United States indirect selling expenses. See id. at 113-14.

Torrington asserts that Commerce reasonably denied the offset, because allowing United States selling expenses to be reduced in the manner claimed by NTN encourages dumping. See Torrington's Resp. at 19. Specifically, Torrington argues that the more a company dumps its merchandise in the United States, the alleged interest expenses on antidumping duty cash deposits will become greater. See id. at 19. Torrington contends that as the interest expense becomes greater, so does the offset to its reported United States indirect selling expenses and, indeed, if the offset becomes sufficiently large, dumping margins could disappear over time. See id. Torrington also argues that there is no evidence that NTN actually obtained loans for the purpose of posting cash deposits

and, therefore, there is no factual basis for the adjustment. See id.


### C. Analysis

Although NTN correctly points out that interest expenses incurred on financing antidumping cash deposits are not "selling expenses," see Federal-Mogul Corp., 20 CIT at 1140-41, 950 F. Supp. at 1183, the Court disagrees that Commerce is prohibited from altering its methodology of making adjustments to United States indirect selling expenses. This Court has noted that "Commerce may, in certain circumstances, reasonably change its methodology from review to review." Timken Co. v. United States, 21 CIT 1313, 1332, 989 F. Supp. 234, 250 (1997), vacated in part on other grounds, 1 F. Supp. 2d 1390, 1393 (1998) (allowing Commerce to alter its methodology with respect to interest expenses incurred for financing cash deposits).

Consequently, since 19 U.S.C. § 1677a(d) does not provide clear guidance with respect to the adjustment, the issue for the Court is whether Commerce's interpretation of the statute was reasonable. The Court finds that Commerce reasonably interpreted the statute by concluding that financing expenses incurred on antidumping duty cash deposits are not an inevitable consequence of the antidumping duty order and that, with respect to imputed

interest costs, there is no real opportunity cost associated with cash deposits when the paying of such deposits is a precondition for doing business in the United States.  Further, the Court finds that NTN failed to provide any evidence on record that supported its claim that it actually or approximately incurred the alleged interest expenses on antidumping duty cash deposits.  Commerce acted rationally in denying NTN's claimed interest-expense adjustment and, therefore, Commerce's determination is sustained.

## V.    Profit Calculation for CV (SKF, FAG, INA)

Commerce applied the "preferred" method for calculating CV cost pursuant to 19 U.S.C. § 1677b(e)(2)(A), calculating an actual profit ratio for FAG, SKF and INA.  See Def.'s Mem. at 17 (citing Final Results, 62 Fed. Reg. at 54,063.  First, Commerce subtracted costs and expenses from the home-market price in order to calculate the profit for each sale of the foreign like product in the ordinary course of trade.  Commerce then aggregated the profit for all sales at the same LOT and divided this profit by the exporter's or producer's aggregate cost totals for the same sales.  See Def.'s Mem. at 17-18 (citing Preliminary Results, 62 Fed. Reg. at 31,571).

### A.    Contentions of the Parties

FAG contends that Commerce acted contrary to the plain meaning of 19 U.S.C. § 1677b(e)(2)(A) in calculating CV profit on an

aggregated "class or kind" basis while disregarding sales outside the ordinary course of trade.  <u>See</u> FAG's Br. at 5-10.  FAG maintains that the statute permits Commerce to use an aggregated CV-profit calculation only if no below-cost sales are disregarded in the calculation.  <u>See id.</u> at 10-11.  SKF and INA make similar arguments.  <u>See</u> SKF's Br. at 38-57; INA's Br. at 15-28.

Commerce maintains that it applied a reasonable interpretation of § 1677b(e)(2)(A) and properly based CV profit on aggregate profit data of all foreign like products under consideration for NV while disregarding below-cost sales.  <u>See</u> Def.'s Mem. at 12-29. Torrington generally agrees with Commerce.  <u>See</u> Torrington's Resp. at 23-25.

### B.   Analysis

In <u>RHP Bearings Ltd. v. United States</u>, 23 CIT ___, 83 F. Supp. 2d 1322 (1999), this Court held, <u>inter alia</u>, that Commerce's CV-profit methodology, which consists of using the aggregate data of all foreign like products under consideration for NV, is consistent with the antidumping statute.  Since FAG's, SKF's and INA's arguments and the methodology at issue in this case are practically identical to those presented in <u>RHP Bearings</u>, the Court adheres to its reasoning in <u>RHP Bearings</u> and, therefore, finds  Commerce's CV-profit methodology to be in accordance with law.  Furthermore,

since the methodology in § 1677b(e)(2)(A) explicitly requires that only sales "in the ordinary course of trade" be included in the calculation, and below-cost sales that were disregarded in determining NV are not part of the "ordinary course of trade," the exclusion of below-cost sales was appropriate. See 19 U.S.C. §§ 1677(15), 1677b(b)(1).

**VI.  Matching United States Sales to "Similar" Home-Market Sales Prior to Resorting to CV (FAG, INA)**

FAG and INA maintain that Commerce erred in resorting to CV without first attempting to match United States sales--export price ("EP") or CEP sales--to "similar" home-market sales in instances where all home-market sales of identical merchandise have been disregarded because they were out of the ordinary course of trade. See FAG's Br. at 12; INA's Br. at 13-15. FAG and INA maintain that a remand is necessary to bring Commerce's practice in line with the CAFC's decision in Cemex, S.A. v. United States, 133 F.3d 897, 904 (Fed. Cir. 1998). Commerce agrees with FAG and INA. See Def.'s Mem. at 30.

The Court agrees with the parties. In Cemex, S.A., the CAFC reversed Commerce's practice of matching a United States sale to CV when the identical or most similar home-market model failed the cost test. See 133 F.3d at 904. The CAFC stated that "[t]he plain language of the statute requires Commerce to base foreign market

value [(now NV)] on nonidentical but similar merchandise [(foreign like product under post-URAA law)] . . . rather than [CV] when sales of identical merchandise have been found to be outside the ordinary course of trade." Cemex, S.A., 133 F.3d at 904. In light of the CAFC's decision in Cemex, S.A., this matter is remanded so that Commerce can first attempt to match United States sales to similar home-market sales before resorting to CV.

## VII. Treatment of Certain Selling Expenses as Indirect Selling Expenses (FAG)

### A. Background

FAG reported certain credits that it has issued to unrelated distributors as compensation for instances when FAG did not have the requested bearing in stock and was able to buy it from the distributor at a preferential price. See FAG's Br. at 19.

Commerce treated the credits as indirect selling expenses. Commerce explained that it treated them as indirect because "FAG did not demonstrate that there is a direct tie between its sales to the distributor and the distributor's sale that generates the payment." Final Results, 62 Fed. Reg. at 54,055.

### B. Contentions of the Parties

FAG argues that the credit would not have been granted had FAG

not requested the distributor make a transaction. See FAG's Br. at
19. FAG maintains that the link between the credit and the
distributor's sale establishes the direct nature of the expense.
See id. FAG claims that "the distributor would not have received
the granted credit but for its original purchase of the bearing
from FAG" and, therefore, the expenses can be properly classified
as direct and allocated on a customer-specific basis. Id. at 19-20
(citing SAA at 823-24).

Commerce replies that because the "expenses related to the
sales of distributors to a third party" rather than "to FAG's
direct sales to the distributors," Commerce classified them as
indirect selling expenses. Def.'s Mem. at 49. Commerce argues that
the credit expenses "are completely unrelated to FAG's sales to its
distributor" and that "FAG is essentially rewarding its distributor
for providing a service because the credits are issued only when
FAG cannot meet a certain request." Id. at 50. Commerce maintains
that because the credit bears no direct relationship to the sales
under review, that is, to the sales by FAG to its distributors, the
expense was properly treated as indirect. See id. Torrington
supports Commerce's treatment of the expense. See Torrington's
Resp. at 16-17.

C.    Analysis

Commerce is required to grant an adjustment to NV for the differences in circumstances of sale ("COS"). See 19 U.S.C. § 1677b(a)(6)(C)(iii). The COS adjustment encompasses direct selling expenses, which are defined as expenses that "result from, and bear a direct relationship to, the particular sale in question." 19 C.F.R. § 351.410(b) and (c). FAG reported the credit expenses at issue as part of the COS adjustment.

Commerce issued a supplemental questionnaire to FAG, asking it to provide evidence of the direct relationship between the sales for which the expense occurred and the sales of the distributors to the distributors' customers. See Final Results, 62 Fed. Reg. at 54,054. FAG replied that "[t]here is no direct tie between FAG"s reported sales to the distributor and the sales of the distributor that generate the payment or credit." FAG KGS Supplemental Questionnaire Resp. for 1995-96 Admin. Review Secs. A-D (12/10/96) (Case No. A-428-801) at 30. Additionally, in its case brief, FAG confirmed that the claimed expense was produced by the distributor's sales to the unrelated party and not by FAG's sales. See FAG Case Brief for 1995-96 Admin. Review (7/1/97) (Case No. A-428-801) at 18-19.

As FAG plainly acknowledges, the credit expense cannot properly be classified as direct because it does not bear a direct relationship to the sales under review, that is, to the sales made

by FAG to the distributor. Because Commerce properly refused to treat the credit expenses at issue as direct, Commerce's determination is sustained.

**VIII. Deduction of Downward Billing Adjustments on Home-Market Sales (INA)**

INA argues that Commerce erred in not allowing downward billing adjustments on home-market sales. See INA's Br. at 9. INA maintains that Commerce's rejection of its adjustments "is based on an erroneous and unwarranted assumption that INA determined such adjustments by allocation" when, in fact, "INA determined billing adjustments on an invoice and product specific basis, not by allocation." Id. at 12.

In the Final Results, Commerce stated that it did not view the omission of downward home-market billing adjustments as a clerical error and refused to allow the adjustment. See Final Results, 62 Fed. Reg. at 54,042. In preparing its arguments to this Court, however, Commerce reviewed the record and concluded "that it erred in denying INA's downward billing adjustments." Def.'s Mem. at 51. Commerce agrees that the case should be remanded so that it can grant a downward billing adjustment to INA on its home-market sales. See id. In light of the foregoing, this case is remanded to Commerce to reconsider its determination to deny a downward billing adjustment to INA on its home-market sales.

**IX.  Exclusion of Sales Made Out of the Ordinary Course of Trade from the Home-Market Database (INA)**

**A.   Background**

Commerce is required to base its NV calculation upon "the price at which the foreign like product is first sold . . . in the ordinary course of trade."   19 U.S.C. § 1677b(a)(1)(B)(i). Analogously, CV must be calculated using "amounts incurred . . . for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country . . . ."   19 U.S.C. § 1677b(e)(2)(A).   INA contended during the review that Commerce should have excluded one specific sale "that by any measure was made at an aberrational price with an abnormally high profit" as being outside of the ordinary course of trade.   Final Results, 62 Fed. Reg. at 54,066.   Commerce rejected INA's contention, explaining as follows:

> The presence of profits higher than those of numerous other sales does not necessarily place the sale outside the ordinary course of trade for purposes of computing CV profit.  In order to determine that a sale is outside the ordinary course of trade due to abnormally high profits, there must be certain unique and unusual characteristics related to the sale in question.   However, the respondents have provided no information other than the numerical profit amounts to support their contention that certain HM sales had abnormally high profits. Accordingly, we have not excluded INA's specific sale from the CV-profit calculation.

Id.

B.    Contentions of the Parties

INA argues that Commerce's failure to exclude one of its sales with an unusually high price and profit level from the final results calculation was inconsistent with 19 U.S.C. § 1677b(a)(1)(B) and the SAA, both of which clearly instruct Commerce to make such an exclusion.  See INA's Br. at 29. INA argues that "the SAA makes clear that aberrational price and abnormally high profits are per se characteristics of sales outside the ordinary course of trade and, accordingly, that no other 'unique and unusual characteristics' need be shown."  Id. at 30.  INA also contends that Commerce's position is contrary to 19 C.F.R. § 351.102(d). See id. at 30-31.

Commerce alleges that it properly exercised its discretion in rejecting INA's argument that Commerce must disregard sales with high profit levels as sales not in the ordinary course of trade because "INA failed to provide the necessary additional evidence to support its claim" and, therefore, Commerce's decision to treat the sale as within the ordinary course of trade was proper. Def.'s Mem. at 57.  Commerce contends that INA's refusal to provide requested information prevented Commerce from evaluating all of the relevant circumstances particular to the sales in question. See id. at 58.

Torrington claims that Commerce properly rejected INA's request to exclude high-price and high-profit sales from the NV and CV calculation because: (1) a higher price or profit on a particular sale does not establish that a sale is outside the ordinary course of trade; and (2) INA failed to show that the contested sales were not in the ordinary course of trade. See Torrington's Resp. at 21-22.

**C.    Analysis**

The term "ordinary course of trade" is defined as:

the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind. [Commerce] shall consider the following sales and transactions, among others, to be outside the ordinary course of trade:
        (A)    Sales disregarded under section 1677b(b)(1) of this title.
        (B)    Transactions disregarded under section 1677b(f)(2) of this title.

19 U.S.C. § 1677(15) (emphasis supplied). Section 1677b(b)(1) deals with below-cost sales. Section 1677b(f)(2) deals with sales to affiliated persons. Therefore, Commerce must consider below-cost sales and sales between related parties as sales outside the ordinary course of trade. Although § 1677b(b)(1)'s below-cost sales and § 1677b(f)(2)'s affiliated-party transactions are specifically designated as outside the ordinary course of trade, the "among others" language of § 1677(15) clearly indicates that

other types of sales could be excluded as being outside the ordinary course of trade.[5]

Determining whether a sale or transaction is outside the ordinary course of trade is a question of fact. In making this determination, Commerce considers not just "one factor taken in isolation but rather . . . all the circumstances particular to the sales in question." Murata Mfg. Co. v. United States, 17 CIT 259, 264, 820 F. Supp. 603, 607 (1993) (citation omitted). Thus, Commerce has the discretion to interpret § 1677(15) to determine

---

[5] The SAA accompanying the URAA provides that aside from §§ 1677b(b)(1), (f)(2) transactions:

> Commerce may consider other types of sales or transactions to be outside the ordinary course of trade when such sales or transactions have characteristics that are not ordinary as compared to sales or transactions generally made in the same market. Examples of such sales or transactions include merchandise produced according to unusual product specifications, merchandise sold at aberrational prices, or merchandise sold pursuant to unusual terms of sale. As under existing law, amended section 771(15) does not establish an exhaustive list, but the Administration intends that Commerce will interpret section 771(15) in a manner which will avoid basing normal value on sales which are extraordinary for the market in question, particularly when the use of such sales would lead to irrational or unrepresentative results.

H.R. DOC. No. 103-316, vol. 1, at 834 (emphasis supplied). The SAA also provides that "[o]ther examples of sales that Commerce could consider to be outside the ordinary course of trade include sales of off-quality merchandise, sales to related parties at non-arm's-length prices, and sales with abnormally high profits." Id. at 839-40.

which sales are outside the ordinary course of trade, such as sales
involving aberrational prices and abnormally high profit levels.

In resolving questions of statutory interpretation, the
Chevron test requires this Court first to determine whether the
statute is clear on its face. If the language of the statute is
clear, then this Court must defer to Congressional intent. See
Chevron, 467 U.S. at 842-43. If the statute is unclear, however,
then the question for the Court is whether the agency's answer is
based on a permissible construction of the statute. See id. at
843; see also Corning Glass Works v. United States Int'l Trade
Comm'n, 799 F.2d 1559, 1565 (Fed. Cir. 1986) (finding the agency's
definitions must be "reasonable in light of the language, policies
and legislative history of the statute").

Here, the statutory provision defining what is considered
outside the ordinary course of trade is unclear. While the statute
specifically defines "ordinary course of trade," it provides little
assistance in determining what is outside the scope of that
definition. The statute merely identifies a non-exhaustive list of
situations in which sales or transactions are to be considered
outside the "ordinary course of trade." This Court finds the
statute is ambiguous as to what constitutes a sale outside the
ordinary course of trade. What Congress intended to exclude from
the "ordinary course of trade" is also not immediately clear from

the statute's legislative history. In the SAA, Congress stated that in addition to the specific types of transactions to be considered outside the ordinary course of trade, "Commerce may consider other types of sales or transactions to be outside the ordinary course of trade when such sales or transactions have characteristics that are not ordinary as compared to sales or transactions generally made in the same market." SAA at 834. Congress also stated that as the statute does not provide an exhaustive list of situations which qualify as being outside the ordinary course of trade, "the Administration intends that Commerce will interpret section 771(15) [19 U.S.C. § 1677(15)] in a manner which will avoid basing normal value on sales which are extraordinary for the market in question." Id. This Court finds the legislative history is also ambiguous as to what constitutes a sale outside the ordinary course of trade.

Because neither the statutory language nor the legislative history explicitly establishes what is considered to be outside the "ordinary course of trade," the Court assesses the agency's interpretation of the provision to determine whether the agency's interpretation is reasonable and in accordance with the legislative purpose. See Chevron, 467 U.S. at 843. In determining whether Commerce's interpretation is reasonable, the Court considers, among other factors, the express terms of the provisions at issue, the

objectives of those provisions, and the objective of the
antidumping scheme as a whole. The purpose of the ordinary course
of trade provision is "to prevent dumping margins from being based
on sales which are not representative" of the home market. See
Monsanto Co. v. United States, 12 CIT 937, 940, 698 F. Supp. 275,
278 (1988). Commerce's methodology for deciding when sales are
outside the "ordinary course of trade" has been to examine the
totality of the circumstances surrounding the sale or transaction
in question to determine whether the sale or transaction is
extraordinary. Commerce's methodology allows it, on a case-by-case
basis, to examine all conditions and practices which may be
considered ordinary in the trade under consideration and to
determine which sales or transactions are, therefore, outside the
ordinary course of trade. Because such a methodology gives
Commerce wide discretion in deciding under what circumstances sales
or transactions are outside the ordinary course of trade and
circumstances differ in each case, this Court finds that, in light
of the statute's legislative purpose, Commerce's interpretation of
the statute and exercise of its discretion by requiring additional
evidence demonstrating that sales with high profit levels were
outside of the ordinary course of trade before excluding such sales
from the NV and CV calculations was reasonable.

INA provided Commerce with insufficient evidence to show that

Commerce should have excluded sales with abnormally high prices or profits. The mere fact of abnormally high prices or profits is not enough to put these sales outside of the ordinary course of trade. The presence of prices or profits higher than those of other sales is merely an element for Commerce to take into consideration and does not necessarily place the sales outside of the ordinary course of trade; nor does it strip Commerce of the right to exercise its discretion and conclude that sales with abnormally high prices or profits lack the characteristics necessary to place them outside the ordinary course of trade.

Thus, because Commerce's interpretation and application of the statute was reasonable and the record reflects that INA did not provide sufficient additional evidence that supports its claim that the disputed sales were extraordinary for the market in question, Commerce was justified in its decision to include INA's sales in the NV and CV calculations.

X. **Inclusion of Zero-Priced United States Transactions in the Margin Calculations (INA)**

A. **Background**

Commerce had requested certain information in its questionnaire to INA regarding transactions that INA claimed to involve sample or prototype sales. Commerce required respondents to identify such transactions, and also requested the following

information:

    1) Describe how the orders for these sales were
    communicated.
    2) What documents are available to demonstrate that these
    sales are samples or prototypes?
    3)Did the customer in question purchase these particular
    items before the date of the claimed sample sale? If so,
    how many were purchased?
    4) Contrast the prices and quantities involved in these
    purchases with normal sales of these items, if any, to
    other customers and subsequent sales to the same
    customer.
    5) What was the ultimate disposition of these bearings?
    Did title pass to the recipient of the merchandise? Were
    the bearings tested and destroyed during trial
    application?

INA Questionnaire Resp. for 1995-96 Admin. Review Sec. B (9/10/96)

(Case No. A-428-801) at C-53.  INA deemed the information

irrelevant and did not provide it, stating the following:

        Since INA-USA cannot systematically identify all
    transactions that might be considered to involve samples,
    it has omitted this field.  It is the understanding of
    INA-USA that the Department does not distinguish between
    sample transactions and other transactions in analyzing
    U.S. sales, in any event.  Transactions involving
    bearings that were provided to the customer at no charge
    can be identified in the U.S. sales files by gross unit
    price of zero in field 16.0.

Id. at C-54.


    Subsequently, the CAFC promulgated its decision in NSK Ltd. v.

United States ("NSK"), 115 F.3d 965, 975 (Fed. Cir. 1997).  In NSK,

the CAFC held "that the term 'sold' . . . requires both a transfer

of ownership to an unrelated party and consideration." 115 F.3d at

975.  Thus, a zero-priced transaction does not qualify as a "sale"

and, therefore, by definition cannot be included in Commerce's NV calculation. The distribution of AFBs for no consideration falls outside the purview of 19 U.S.C. § 1673 (1994).

In the final results, Commerce reviewed the record information for each respondent who reported zero-priced samples to ascertain whether each respondent appeared to have received consideration for the samples. See Def.'s Mem. at 60. Commerce reviewed the questionnaire responses and "when the respondent had responded fully and the response provided no indication that the respondent had received consideration for the sample," Commerce excluded the transaction from the margin calculation. Id. With respect to INA, Commerce found, as facts available, that INA received consideration for the sample. See id. In the Final Results, Commerce stated the following:

> [T]he party in possession of the information has the burden of producing that information, particularly when seeking a favorable adjustment or exclusion. INA did not answer our questions regarding the purchase history of parties receiving samples. INA also did not answer our questions regarding the prices and quantities involved in sample transactions. The answers to these questions would have aided us in determining whether INA received a bargained-for exchange from its U.S. customers. Lacking knowledge of the details of these transactions, we cannot conclude that INA received no consideration for these alleged samples. In other words, because INA impeded our investigation of these transactions, we determined that an adverse inference is appropriate. Therefore, for these final results, we have included INA's sample sales in its U.S. sales database.

62 Fed. Reg. at 54,071.

   **B.    Contentions of the Parties**

   INA argues that in light of <u>NSK</u>, the Court should remand the matter to Commerce to exclude its zero-value transactions from the margin calculations.  <u>See</u> INA's Br. at 32-37.  INA points to its questionnaire response to show that bearings provided at no charge could be identified by their zero price in the sales listing.  <u>See</u> <u>id.</u> at 35.  INA argues that at the time it responded to Commerce's questionnaire, the issue of whether INA received consideration was irrelevant, since Commerce considered the transaction to be a covered sale irrespective of any consideration involved.  <u>See id.</u> INA notes that in its questionnaire, Commerce never directly asked whether INA received consideration.  <u>See id.</u> 35-36.

   INA also argues that Commerce did not provide INA an opportunity to remedy any deficiencies of information regarding United States sample transactions prior to applying facts available, as mandated by 19 U.S.C. § 1677m(d).  <u>See id.</u> at 36. INA argues "Commerce did not ask any question concerning whether or not INA received consideration for any reported transactions, Commerce did not notify INA of any deficiency in its response . . . and the issue of consideration did not become relevant until after the factual record in the review was closed" and, therefore,

Commerce should not have resorted to adverse fact available. Id.
INA also contends that there is no indication that INA received any
consideration for the merchandise. See id.

Commerce does not dispute INA's reading of NSK, but maintains
that INA's zero-priced United States sales were properly included
in its dumping margin as facts available because INA refused to
provide information that would have helped Commerce determine
whether INA received consideration for the transactions. See
Def.'s Mem. at 58. Commerce maintains that "[b]y declining to
respond to the questions regarding U.S. samples, INA chose to take
its chances as to whether such information would be relevant to
Commerce's final results." Id. at 62. Commerce believes that its
resort to adverse facts available was proper because the record was
missing necessary information and INA failed to act to the best of
its ability to provide the information. See id.

Torrington argues that money is not the only form of
consideration cognizable under the antidumping law and, therefore,
INA's declaration that the sales were at zero price does not mean
they should automatically be excluded. See Torrington's Resp. at
27-28. Torrington points out that other forms of consideration
could be exchanged, such as the situation where "a producer gives
'free' prototypes in the context of a broader understanding
whereunder it develops and provides prototypes before supplying

production quantities," or where a producer offers ten units plus a "sample" at a certain price and the price actually covers eleven units. Id. at 28. Torrington argues that the prototype units or the sample in these situations could be considered to have been "sold" for purposes of NSK. See id. Thus, Torrington believes that Commerce was correct in rejecting INA's claim since Commerce did not have the information necessary to make its determination. See id. at 29.

### C.   Analysis

The antidumping statute mandates that Commerce use "facts otherwise available" (commonly referred to as "facts available") if "necessary information is not available on the record" of an antidumping proceeding. 19 U.S.C. § 1677e(a)(1). In addition, Commerce may use facts available where an interested party or any other person: (1) withholds information that has been requested by Commerce; (2) fails to provide the requested information by the requested date or in the form and manner requested, subject to 19 U.S.C. § 1677m(c)(1), (e); (3) significantly impedes an antidumping proceeding; and (4) provides information that cannot be verified as provided in section 19 U.S.C. § 1677m(i). See id. § 1677e(a)(2)(A)-(D). Section 1677e(a) provides, however, that the use of facts available shall be subject to the limitations set forth in 19 U.S.C. § 1677m(d).

Section 1677m(d), entitled "deficient submissions," provides that if Commerce determines that a response to a request for information does not comply with the request, the agency shall promptly inform the person submitting the response of the deficiency and permit that person an opportunity to remedy or explain the deficiency.  If the remedial response or explanation provided by the party is found to be "not satisfactory" or untimely, Commerce may, subject to § 1677m(e), disregard "all or part of the original and subsequent responses" in favor of facts available.  Id. § 1677m(d).

Once Commerce determines that use of facts available is warranted, § 1677e(b) permits Commerce to apply an "adverse inference" if it can find that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information."  Such an inference may permit Commerce to rely on information derived from the petition, the final determination, a previous review or any other information placed on the record.  See 19 U.S.C. § 1677e(c) (1994).  When Commerce relies on information other than "information obtained in the course of the investigation or review, [Commerce] shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal."  Id.

In order to find that a party "has failed to cooperate by not acting to the best of its ability," it is not sufficient for Commerce to merely assert this legal standard as its conclusion or repeat its finding concerning the need for facts available. See Ferro Union, Inc. v. United States, 23 CIT ___, ___, 44 F. Supp. 2d 1310, 1329 (1999) ("Once Commerce has determined under 19 U.S.C. § 1677e(a) that it may resort to facts available, it must make additional findings prior to applying 19 U.S.C. § 1677e(b) and drawing an adverse inference."). Rather, to be supported by substantial evidence, Commerce must clearly articulate: (1) "why it concluded that a party failed to comply to the best of its ability prior to applying adverse facts," and (2) "why the absence of this information is of significance to the progress of [its] investigation." Ferro Union, Inc., 23 CIT at ___, 44 F. Supp. 2d at 1331.

The Final Results do not clarify (1) whether INA was given prompt notice of the deficiency regarding the sample sales data and given the opportunity to remedy the deficiency, or (2) that even if INA provided a remedial response, whether Commerce determined that such a response was not satisfactory or untimely, as required by 19 U.S.C. § 1677m(d). Although Commerce asserted in its brief that INA met the requirements of 19 U.S.C. § 1677e(a), (b), see Def.'s Mem. at 62-63, the Court cannot defer to this post hoc

rationalization as a basis to uphold Commerce's decision to use facts available because such a decision must be sustained, if at all, on the same basis as the reasoning articulated in the final determination itself, see Hoogovens Staal BV v. United States, 24 CIT __, __, 86 F. Supp. 2d 1317, 1331 (2000) (holding that "a reviewing court must evaluate the validity of an agency's decision on the basis of the reasoning presented in the decision itself. An agency determination 'cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order . . . .'") (quoting SEC v. Chenery Corp., 318 U.S. 80, 94 (1943)); see also Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962) ("The courts may not accept . . . counsel's post hoc rationalizations for agency action; . . . an agency's discretionary order [must] be upheld, if at all, on the same basis articulated in the order by the agency itself.").[6]    Further, even if the Court were to assume that

_____

[6]  Indeed, the Supreme Court has opined:

> If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, 'We must know what a decision means before the duty becomes ours to say whether it is right or wrong.'

SEC v. Chenery Corp., 332 U.S. 194, 196-97 (1947) (quoting United States v. Chicago, M., St. P. & P.R. Co., 294 U.S. 499, 511

Commerce met § 1677e(a)'s criteria for using facts available, the Court notes that Commerce did not articulate in the Final Results whether it made any "additional findings" that INA had failed to act to the best of its ability before applying an adverse inference under § 1677e(b).

The Court, however, agrees with Commerce's finding that it should not automatically exclude from its dumping margin analysis "any transaction to which a respondent applies the label 'sample.'" Final Results, 62 Fed. Reg. at 54,069.  In determining whether to exclude samples from the sales database, as Commerce correctly noted, it must "examine the information on the record to determine whether the recipients of the samples have undertaken actual obligations to purchase AFBs from the provider of the free bearings or whether the recipients remained free to purchase bearings of their own accord."  Id.  This approach is clearly consistent with the CAFC's decision in NSK, where the appellate court determined that a foreign manufacturer's AFB "samples given to potential customers at no charge lacked consideration [because] . . . there is no evidence that potential customers had any obligation regarding samples received from [the manufacturer].   These potential customers were free to transact with [the manufacturer] based solely on their whim."  115 F.3d at 975 (noting that "[w]hen

(1935)).

the promisor may choose to perform based solely on whim, then the promise will not serve as consideration") (citing 3 Williston on Contracts, § 7:7 at 89 (4th ed. 1992))).  The CAFC explained that "[c]onsideration generally requires a bargain-for exchange," id. (citing 3 Williston on Contracts, § 7:2 at 18-19), and also noted that a "sale" is defined as "'the act of selling: a contract transferring the absolute or general ownership of property from one person . . . to another for a price (as a sum of money or any other consideration).'"  Id. at 974 (quoting Webster's Third New International Dictionary 2003 (1986)).  In others words, as Commerce accurately noted in the Final Results, consideration, or "price," is not necessarily limited to a "sum of money."  See 62 Fed. Reg. at 54,069 (stating that Commerce would not limit its "review of consideration to the payment of a monetary price for the sample products").

The Court also notes that a respondent still maintains the burden of showing that there is either no consideration or no transfer of ownership to an unrelated party in order to exclude the sample sales from the dumping margin analysis.  See generally Timken Co. v. United States, 11 CIT 786, 804, 673 F. Supp. 495, 513 (1987) (stating that Commerce "acts reasonably in placing the burden of establishing adjustments on a respondent that seeks the adjustments and that has access to the necessary information").

In light of the considerable uncertainty left by the Final Results, the Court cannot conclude that Commerce's use of adverse facts available was warranted under 19 U.S.C. § 1677e(a). The Court, therefore, remands the issue to Commerce to clarify how it complied with the statutory framework of 19 U.S.C. §§ 1677e, 1677m for using facts available and applying an adverse inference. If in the remand results Commerce determines it did not adhere to all of the statutory prerequisite conditions, Commerce must give INA the opportunity to remedy or explain any deficiency regarding its alleged sample sales.

## XI. Commerce's Refusal to Exclude Home-Market Sample Sales –Exhaustion of Administrative Remedies (INA)

INA argues that Commerce erred in refusing to exclude home-market sales that INA alleges are outside the ordinary course of trade. See INA's Br. at 37. INA alleges that Commerce properly excluded zero-priced transactions, but erroneously refused to find that "other sample transactions" were outside the ordinary course of trade. See id. at 38. INA believes that Commerce requested information on sample sales for the sole purpose of determining whether they were made in the ordinary course of trade and, therefore, Commerce was compelled to determine whether such sales were made in the ordinary course of trade regardless of whether INA raised the issue. See id.

Commerce contends that the Court should not consider the issue because INA failed to exhaust its administrative remedies.  See Def.'s Mem. at 63.  In the alternative, Commerce argues that should the Court find that INA was not obligated to exhaust its administrative remedies, then the Court should sustain Commerce's determination because INA failed to show that its home-market sample sales were not in the ordinary course of trade.  See id. Torrington generally supports Commerce's position.  See Torrington's Resp. at 30.

INA flatly concedes that it "did not raise any issue with respect to home market sample sales in its case brief."  INA's Br. at 37.  INA appears to be arguing that this Court should consider the issue despite INA's failure to raise it at the administrative level because "Commerce determined in its final results notice to exclude INA's zero-priced home market sample transactions but at the same time failed," on its own initiative, "to consider whether INA's other home market sample transactions should be excluded." Id.

The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for consideration before raising them to the Court. See Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143, 155 (1946) ("A reviewing court

usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action."). In this case, however, there is no absolute requirement of exhaustion in the Court of International Trade. See Alhambra Foundry Co. v. United States, 12 CIT 343, 346-47, 685 F. Supp. 1252, 1255-56 (1988). Section 2637(d) of Title 28 of the United States code directs that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." By its use of the phrase "where appropriate," Congress vested discretion in the Court to determine the circumstances under which it shall require the exhaustion of administrative remedies. See Cemex, S.A., 133 F.3d at 905. "[E]ach exercise of judicial discretion in not requiring litigants to exhaust administrative remedies" has been characterized as "'an exception to the doctrine of exhaustion.'" Alhambra Foundry, 12 CIT at 347, 685 F. Supp. at 1256 (quoting Timken Co. v. United States, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986)).

In the past, the Court has exercised its discretion to obviate exhaustion where: (1) requiring it would be futile, see Rhone Poulenc, S.A. v. United States, 7 CIT 133, 135, 583 F. Supp. 607, 610 (1984) ("it appears that it would have been futile for

plaintiffs to argue that the agency should not apply its own regulation"), or would be "inequitable and an insistence of a useless formality" as in the case where "there is no relief which plaintiff may be granted at the administrative level," United States Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 201, 544 F. Supp. 883, 887 (1982);  (2) a subsequent court decision has interpreted existing law after the administrative determination at issue was published, and the new decision might have materially affected the agency's actions, see Timken Co., 10 CIT at 93, 630 F. Supp. at 1334;  (3) the question is one of law and does not require further factual development and, therefore, the court does not invade the province of the agency, see id.;  R.R. Yardmasters of America v. Harris, 721 F.2d 1332, 1337-39 (D.C. Cir. 1983);  and (4) the plaintiff had no reason to suspect that the agency would refuse to adhere to "clearly applicable precedent," Philipp Bros., Inc. v. United States, 10 CIT 76, 79-80, 630 F. Supp. 1317, 1320-21 (1986).

As INA readily admits, it has failed to exhaust its administrative remedies.  Additionally, there are no reasons or special circumstances here compelling the Court to decline to require exhaustion.  INA had the opportunity to bring the issue before Commerce at the administrative level but failed.  The only argument INA makes in its defense is that Commerce, on its own

initiative, should have determined whether the sales were made
outside the ordinary course of trade.  The burden is on INA to
raise the issue at the administrative level and demonstrate that
the home-market sample sales were outside the ordinary course of
trade; it is not Commerce's responsibility to shoulder this burden.
Commerce's determination is affirmed.

**XII. Commerce's Calculation of a Single Weighted-Average CEP-Profit
Rate for Each Class or Kind of Merchandise (INA)**

    **A.    Background**

In calculating CEP, Commerce must reduce the starting price
used to establish CEP by "the profit allocated to the expenses
described in paragraphs (1) and (2)" of § 1677a(d) (1994).  19
U.S.C. § 1677a(d)(3).  Under 19 U.S.C. § 1677a(f), the "profit"
that will be deducted from this starting price will be "determined
by multiplying the total actual profit by [a] percentage"
calculated "by dividing the total United States expenses by the
total expenses."  Id. § 1677a(f)(1), (2)(A).  Section
1677a(f)(2)(B) defines "total United States expenses" as the total
expenses deducted under § 1677a(d)(1) and (2), that is,
commissions, direct and indirect selling expenses, assumptions and
the cost of any further manufacture or assembly in the United
States.

Section 1677a(f)(2)(C) establishes a tripartite hierarchy of

methods for calculating "total expenses." First, "total expenses" will be "[t]he expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country" if Commerce requested such expenses for the purpose of determining NV and CEP. Id. § 1677a(f)(2)(C)(i). If category (i) does not apply, then "total expenses" will be "[t]he expenses incurred with respect to the narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise." Id. § 1677a(f)(2)(C)(ii). If neither category (i) or (ii) applies, then "total expenses" will be "[t]he expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise." Id. § 1677a(f)(2)(C)(iii). "Total actual profit" is based on whichever category of merchandise is used to calculate "total expenses" under § 1677a(f)(2)(C). See id. § 1677a(f)(2)(D).

Commerce calculated the CEP-profit rate on a weighted-average class or kind basis, rejecting INA's request to perform the calculation on a product-specific basis. See Final Results, 62 Fed. Reg. at 54,072. In rejecting INA's arguments, Commerce stated the following:

> [N]either the statute nor the SAA requires us to
> calculate CEP profit on bases more specific than the
> subject merchandise as a whole. Respondent's suggestion

would add a layer of complexity to an already complicated exercise with no increase in accuracy. Furthermore, a subdivision of the CEP-profit calculation would be more susceptible to manipulation.

Id. (citation omitted).


B.    Contentions of the Parties

INA contends that Commerce erred in calculating CEP-profit rate on a class or kind basis. See INA's Br. at 38. INA maintains that Commerce should have calculated CEP-profit rate on a product-specific basis. See id. at 39. INA argues that the purposes of the antidumping statute are fulfilled only when "CEP profit for each transaction [is] based only on the actual profit on the U.S. transaction," and Commerce's methodology distorts the CEP calculation by imposing a uniform profit rate on all transactions without regard to differences in actual profit between products. Id. at 43.

Commerce argues because the statute does not dispose of the particular issue, the Court must accept Commerce's interpretation of the law if the interpretation is permissible. See Def.'s Mem. at 74. Additionally, Commerce argues that INA's argument is not persuasive, and that this Court should follow the court's decision in Toyota Motor Sales v. United States, 22 CIT 643, 15 F. Supp. 2d 872 (1998), which addressed a similar issue. See id. at 73-75. Torrington agrees with Commerce's position. See Torrington's Resp.

at 32.


   C.   Analysis

   In resolving questions of statutory interpretation, the Chevron test requires this Court first to determine whether the statute is clear on its face. If the language of the statute is clear, then this Court must defer to Congressional intent. See Chevron, 467 U.S. at 842-43. If the statute is unclear, however, then the question for the Court is whether the agency's answer is based on a permissible construction of the statute. See id. at 843; see also Corning Glass Works, 799 F.2d at 1565 (finding the agency's definitions must be "reasonable in light of the language, policies and legislative history of the statute").

   Section 1677a(f), as Commerce correctly notes, does not direct nor prohibit Commerce from calculating CEP profit on a class or kind basis. Accordingly, the Court's duty under Chevron is to review the reasonableness of Commerce's statutory interpretation. See IPSCO, Inc., 965 F.2d at 1061 (quoting Chevron, 467 U.S. at 844).

   This Court upheld Commerce's refusal to calculate CEP on an LOT-specific basis in NTN Bearing Corp. of Am., 24 CIT at ___, 104 F. Supp. 2d at 133-35, finding it to be reasonable and in accordance with law. The Court examined the language of the

statute and concluded that the statute clearly contemplates that, in general, the "narrowest category" will include the class or kind of merchandise that is within the scope of an investigation or review.  The Court based its conclusion on its examination of subsections (ii) and (iii) of § 1677a(f)(C)'s "total expense" definition.  Both subsections refer to "expenses incurred with respect to the narrowest category of merchandise . . . which includes the subject merchandise."  The term "subject merchandise" is defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921."  19 U.S.C. § 1677(25).

Similarly, the Court finds that Commerce reasonably interpreted § 1677a(f) in refusing to apply a narrower subcategory of merchandise such as one based on product.  The Court, moreover, agrees with Commerce's conclusion that a "subdivision of the CEP-profit calculation would be more susceptible to manipulation," a result that Congress specifically warned Commerce to prevent.  Final Results, 62 Fed. Reg. at 54,072.  Finally, even if the Court were to assume that a narrower basis for calculating CEP profit would be justified under some circumstances, INA failed to provide adequate factual support of how the CEP-profit calculation was distorted by Commerce's standard methodology.

XIII. Treatment of Imputed Credit and Inventory Carrying Costs in the Calculation of CEP Profit (INA)

A.    Background

INA reported United States sales that Commerce treated as CEP sales pursuant to 19 U.S.C. § 1677a(b), and Commerce deducted an amount for profit allocated to the expenses enumerated by 19 U.S.C. § 1677a(d)(1) and (2).  See 19 U.S.C. § 1677a(d)(3).  In the profit calculation, Commerce excluded imputed expenses and carrying costs from the "total actual profit" calculation, defined in § 1677a(f)(2)(D), and from the "total expenses" calculation, defined in § 1677a(f)(2)(C), but included them in the "total United States expenses" calculation, defined in § 1677a(f)(2)(B).  INA objected to the omission of imputed expenses and carrying costs from "total actual profit" and "total expenses," and Commerce responded with the following:

> [S]ections [1677(f)(1) and 1677(f)(2)(D)] of the Tariff Act state that the per-unit profit amount shall be an amount determined by multiplying the total actual profit by the applicable percentage (ratio of total U.S. expenses to total expenses) and that the total actual profit means the total profit earned by the foreign producer, exporter, and affiliated parties.  In accordance with the statute, we base the calculation of the total actual profit used in calculating the per-unit profit amount for CEP sales on actual revenues and expenses recognized by the company.  In calculating the per-unit cost of the U.S. sales, we have included net interest expense.  Therefore, we do not need to include imputed interest expenses in the "total actual profit"

calculation since we have already accounted for actual interest in computing this amount under section [1677(f)(1)]. When we allocated a portion of the actual profit to each CEP sale, we have included imputed credit and inventory carrying costs as part of the total U.S. expense allocation factor. This methodology is consistent with section [1677(f)(1)] of the statute, which defines "total United States expense" as the total expenses described under section [1677(d)(1) and (2)]. Such expenses include both imputed credit and inventory carrying costs.

Final Results, 62 Fed. Reg. at 54,072.


B.    Contentions of the parties

INA complains that "[i]mputed interest either is or is not an expense for purposes of CEP profit calculation," and that "[i]gnoring imputed interest expense in calculating the profit rate and then applying that profit rate to imputed interest expense in calculating a profit amount results in deduction of imputed expense twice in determining CEP, once as expense and once as a component of profit." INA's Br. at 45. INA maintains that Commerce should include United States credit expense and inventory carrying costs in total expenses. See id.

Commerce maintains that the statute does not define "total expenses" in the same manner as "total United States expenses." See Def.'s Mem. at 81. Commerce argues that it has always deducted imputed expenses from the starting price in CEP transactions and, "[f]or this reason, in determining 'total United States

expenses,['] Commerce includes imputed selling expenses, such as imputed credit and inventory carrying costs." Id. at 82. Contrary to INA's contention, Commerce argues that it does not deduct imputed expenses twice. See id. at 80.

Commerce contends that the provision for "total expenses" merely encompasses "all expenses . . . 'which are incurred by or on behalf of the foreign producer and foreign exporter . . . with respect to the production and sale of such merchandise.'" Id. at 82 (quoting 19 U.S.C. § 1677a(f)(2)(C)). Commerce argues that if "Congress intended that Commerce utilize the same types of expenses for both 'total United States expenses' and 'total expenses,' it would have made that intent clear," and would not have assigned different definitions for each term. Id.

Commerce also maintains that it did not include imputed expenses in "total expenses" since Commerce is required to calculate "total actual profit" on the same basis as "total expenses." See id. at 83. Torrington generally agrees with Commerce. See Torrington's Resp. at 34.

## C. Analysis

To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by Chevron. Under

the first step, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue."  Id. at 842.  "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'"  Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing Chevron, 467 U.S. at 843 n.9).  "The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning.  Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter."  Id. (citations omitted).

The Court finds that Commerce improperly excluded imputed inventory and carrying costs from "total expenses" when it had included these expenses in "total United States expenses."  The plain text of 19 U.S.C. § 1677a provides that Commerce must include imputed credit and inventory carrying costs in "total expenses" when they are included in "total United States expenses."  Section 1677a(f)(2)(B) defines "total United States expenses" as the total expenses deducted under § 1677a(d)(1) and (2), that is, commissions, direct and indirect selling expenses, assumptions, and the cost of any further manufacture or assembly in the United States.  Section 1677a(f)(2)(C) specifies that:

> [t]he term "total expenses" means all expenses in the
> first of the following categories which applies and which

are incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise . . . .

(emphasis added). Commerce determined that the applicable category of expenses to be used for calculating "total expenses" is § 1677a(f)(2)(C)(i), and it consists of all of "[t]he expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country." 19 U.S.C. § 1677a(f)(2)(C)(i)).

Thus, "total United States expenses" are certain enumerated expenses "incurred by or for the account of the producer or exporter, or the affiliated seller in the United States," see § 1677a(d)(1),(2), while "total expenses," in this instance, include

all expenses . . . incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter . . . with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country . . . .

§ 1677a(f)(2)(C)(i). Reading §§ 1677a(d) and (f) together makes it apparent that "total expenses" equals "total United States expenses," that is, those expenses incurred in the United States, plus those expenses incurred in Germany, to produce and sell the subject merchandise in the United States. "Total United States expenses" is a subset of "total expenses." Thus, since Commerce

determined that imputed inventory and carrying costs were to be included in "total United States expenses," they must be included in "total expenses" as well.

Because the text of the statute resolves the issue, it is unnecessary to proceed any further. Accordingly, the Court remands this issue to Commerce. Commerce is directed to include all expenses included in "total United States expenses" in the calculation of "total expenses."

**XIV. Treatment of Certain Rebates and Billing Adjustments Reported by SKF and FAG**

  **A.    Background**

  SKF's Home-market Support Rebates

SKF reported certain home-market support rebates on a customer-specific basis. SKF granted this rebate to its customers, that is, its distributor/dealers, based on invoices from the distributor/dealer to the distributor/dealer's customer. See SKF's Mem. Resp. to Torrington's Mot. J. Agency R. Mem. ("SKF's Resp.") at 36. In accepting SKF's reporting of home-market support rebates on a customer-specific basis, Commerce stated the following:

> We find that SKF Germany's allocation methodologies are not unreasonably distortive. Due to the nature of the support rebates, transaction-specific reporting is not appropriate. SKF Germany grants these rebates to distributors/dealers to ensure that they obtain a minimum

profit level on sales to select customers. Hence, because SKF Germany does not issue these rebates based on specific sales to the distributor/dealers but rather on the sales of the distributors/dealers, SKF Germany cannot report transaction-specific rebate amounts. Rather, SKF Germany has allocated the rebates it granted to a specific customer over all sales to that customer. SKF Germany's allocation methodology is not unreasonably distortive, as we are satisfied that each adjustment was granted in proportionate amounts with respect to the value of sales of in-scope and out-of-scope merchandise.

Final Results, 62 Fed. Reg. at 54,051-52.


### SKF's Home-market Billing Adjustment Two

SKF reported home-market billing adjustment two on a customer-specific basis. Billing adjustment two was related to mulitple invoices, products or invoice lines and was allocated by customer number by "totaling the credits and debits issues to a customer number and dividing this total by total sales to that customer number." SKF's Resp. at 40.


In accepting SKF's methodology, Commerce stated the following:

SKF Germany could not tie these adjustments to a specific transaction because the billing adjustments it reported in this field were part of credit or debit notes, issued to the customer, that related to multiple invoices, products, or invoice lines. In these cases, the most feasible reporting methodology that SKF Germany could use was a customer-specific allocation, given the large volume of transaction involved in these AFB reviews and the time constraints imposed by the statutory deadlines. Furthermore, we found that the products which received the adjustment were similar in terms of value, physical characteristics, and the manner in which they were sold. For these reasons, we find that this methodology is not unreasonably distortive.

Final Results, 62 Fed. Reg. at 54,052.


    FAG's Home-market Rebate

    FAG reported some rebates granted in the home market were
"payable in connection with purchases of certain types of products,
or for purchases made during certain select periods."
Questionnaire Resp. for 1995-96 Admin. Review Sec. B (9/9/96) (Case
No. A-428-801) at 22.  To calculate the rebate for each eligible
customer, "the rebate amount actually paid in 1995 or for 1995
sales was divided by total sales to that customer in 1995 that
generated the rebate," and the "resulting factor was then applied
to the unit price of sales reported for that customer to derive a
rebate amount in DM/unit."  Id.

    In accepting FAG's rebates, Commerce stated the following:

    FAG allocated its rebates on a customer-specific basis
    over sales only of those products that actually received
    rebates.  Therefore, we determine that FAG's methodology
    for reporting rebates is reasonable and not distortive,
    and, in accordance with our policy, we have accepted
    FAG's [home-market] rebates as reported.

Final Results, 62 Fed. Reg. at 54,051.


    B.    Contentions of the Parties

    Torrington alleges that Commerce improperly accepted SKF's and
FAG's home-market support rebates and home-market billing
adjustments.  Torrington maintains that the CAFC has clearly

defined "direct" adjustments to price as those that "vary with the quantity sold, or that are related to a particular sale," and Commerce cannot treat adjustments that do not meet this definition as direct. Torrington's Mem. Supp. Mot. J. Agency R. ("Torrington's Mem.") at 10 (citing Torrington Co. v. United States ("Torrington CAFC"), 82 F.3d 1039, 1050 (Fed. Cir. 1996) (quotations omitted)). Torrington contends that here Commerce "redefined 'direct' to achieve what Torrington CAFC had previously disallowed" by allowing respondents to report allocated post-sale price adjustments ("PSPAs") if they acted to the best of their abilities in light of their record-keeping systems and the results were not unreasonably distortive. Id. at 12. Torrington acknowledges that this Court has already approved of Commerce's practice as applied under post-URAA law in Timken Co. v. United States ("Timken"), 22 CIT 621, 16 F. Supp. 2d 1102 (1998), but asks the Court to reconsider its approval. See id. at 16.

Furthermore, Torrington maintains that the amendments to the URAA did not modify the distinction between direct and indirect adjustments established under pre-URAA law such as Torrington CAFC. See Torrington's Mem. at 14 (citing 19 U.S.C. § 1677a(d)(1)(B), (D) (1994) and § 1677b(a)(7)(B) (1994)). Torrington is not convinced that the SAA contradicts its contentions. See id. at 14-15 (citing SAA at 823-24).

Torrington also contends that even under its new methodology, Commerce's determination was not supported by substantial evidence inasmuch as respondents failed to show that: (1) their reporting methods did not result in distortion; and (2) they put forth their best efforts to report the information on a more precise basis. See id. at 21. Torrington emphasizes that respondents have the burden of showing non-distortion and best efforts, and having failed to carry the burden, they must not benefit from the adjustment. See id. at 22. Torrington, therefore, requests that this Court reverse Commerce's determination with respect to the various PSPAs and remand the case to Commerce with instructions to disallow all of the claims. See id. at 27.

Commerce responds that its treatment of the adjustments is consistent with current law. Even though the adjustments were not reported in a transaction-specific manner, Commerce accepted them as part of its new policy to accept allocated adjustments where it is not feasible for the respondent to report them on a transaction-specific basis and the respondent has acted to the best of its ability. Additionally, Commerce examines whether the allocation method used is not unreasonably distortive pursuant to 19 U.S.C. § 1677m(e).

Commerce argues that Torrington erred in relying on Torrington

CAFC because the case does not stand for the proposition that direct price adjustments may only be accepted when they are reported on a transaction-specific basis. See Def.'s Mem. at 115. Rather, the Torrington CAFC court "merely overturned a prior Commerce practice . . . of treating certain allocated price adjustments as indirect expenses," id. (citing Torrington CAFC, 82 F.3d at 1047-51), and does "not address the propriety of the allocation methods" used in reporting the price adjustments in question, id. at 115-17 (quoting Final Results, 62 Fed. Reg. at 54,050). Also contrary to Torrington's assertion, Commerce did not consider Torrington CAFC as addressing proper allocation methodologies; rather, Commerce only viewed Torrington CAFC as holding that "Commerce could not treat as indirect selling expenses 'improperly' allocated price adjustments." Id. at 117-18. Commerce notes that pursuant to its new methodology, it does not consider price adjustments to be any type of selling expense, either direct or indirect and, therefore, Torrington's argument is not only without support, but also inapposite to Torrington CAFC. See id. at 119.

Additionally, Commerce argues that its findings are supported by substantial evidence. See id. at 139. With respect to SKF's rebates and billing adjustment two, Commerce maintains that: "(1) SKF had reported the adjustments on the most specific basis

possible and, thus, had cooperated to the best of its ability; and

(2) the allocation method was not distortive." Id. at 121-22.

Although Commerce did not verify the data underlying this review,

Commerce verified the treatment of SKF's rebates in the sixth

review of AFBs and, moreover, found no evidence of distortion in

this review. See id. at 122.

Commerce also argues that it properly accepted FAG's home-

market rebates. See id. at 127. Commerce found no evidence that

FAG's adjustments were distortive. See id. at 129. Commerce

determined that "FAG appropriately attributed the rebates to the

sales by customer per the type of merchandise that received rebates

and did not seek to shift the rebate allocation to other sales."

Id.

SKF and FAG generally concur with Commerce's position. See

SKF's Resp.; FAG's Mem. Resp. to Torrington's Mot. J. Agency R.

### C.    Analysis

Commerce's decision to accept SKF's and FAG's billing

adjustments and rebates was supported by substantial evidence and

was fully in accordance with the post-URAA statutory language, as

well as with the SAA that accompanied the enactment of the URAA

because: (1) Commerce reasonably determined that the adjustments

were reliable and could not be reported more specifically; (2)

Commerce properly determined that respondents acted to the best of their abilities in reporting the adjustments; and (3) Commerce properly accepted the allocation methodologies of the respondents after carefully reviewing the differences between such merchandise and ensuring that the allocations were not unreasonably distortive. See Final Results, 62 Fed. Reg. at 54,051-52.

After the enactment of the URAA, Commerce reevaluated its treatment of PSPAs, and since that time it treats them as adjustments to price and not as selling expenses. Indeed, Commerce's treatment of the home-market support rebates, early-payment discounts and billing adjustments as adjustments to price instead of selling expenses is the issue left unanswered by the pre-URAA cases upon which Torrington relies, namely, Torrington CAFC; Koyo Seiko Co. v. United States ("Koyo"), 36 F.3d 1565 (Fed. Cir. 1994); and Consumer Prods. Div., SCM Corp. v. Silver Reed Am., Inc.("Consumer Products"), 753 F.2d 1033 (Fed. Cir. 1985).[7]

---

[7] In Torrington CAFC, the Court of Appeals did not hold that billing adjustments must be treated as selling expenses. The Torrington CAFC court specifically noted that it was treating billing adjustments as selling expenses only because there was no argument offered suggesting otherwise, and the issue whether such treatment was appropriate remained open. Torrington CAFC, 82 F.3d at 1050 n.15. Torrington's reliance on Koyo and Consumer Products is equally unjustified. The Koyo court, citing Consumer Products, noted that "[d]irect selling expenses are 'expenses which vary with the quantity sold, such as commissions'" and did not address the issue of billing adjustments. Koyo, 36 F.3d at 1569 n.4 (quoting Consumer Products, 753 F.2d at 1035). Because these cases address Commerce's treatment of selling expenses, and Commerce did not

The Court disagrees with Torrington that <u>Torrington CAFC</u> mandates that direct price adjustments may only be accepted when they are reported on a transaction-specific basis. Rather, <u>Torrington CAFC</u> merely overturned a prior Commerce practice of treating certain allocated price adjustments as indirect selling expenses and did not address the propriety of the allocation methods that respondents used in reporting the price adjustments in question. Although (1) "Commerce treated rebates and billing adjustments as selling expenses in preceding reviews under pre-URAA law," and (2) "previously decided that such adjustments are selling expenses and, therefore, should not be treated as adjustments to price," this did not "preclude Commerce's change in policy or this Court's reconsideration of its stance in light of the newly-amended antidumping statute [(that is, 19 U.S.C. § 1677m(e) (1994))]." <u>Timken</u>, 16 F. Supp. 2d at 1107. "Neither the pre-URAA nor the newly-amended statutory language imposes standards establishing the circumstances under which Commerce is to grant or deny adjustments to NV for PSPAs." <u>Id.</u> at 1108 (citing <u>Torrington CAFC</u>, 82 F.3d at 1048). Moreover, 19 U.S.C. § 1677m(e) "specifically directs that Commerce shall not decline to consider an interested party's submitted information if that information is necessary to the

---

treat the adjustments at issue as selling expenses, these cases are irrelevant to the issue at hand.

determination but does not meet all of Commerce's established requirements, if the [statute's] criteria are met." Id.

Commerce applied its post-URAA methodology to analyze adjustments to price, explaining that Commerce accepted PSPAs as direct adjustments to price if Commerce determined that a respondent, in reporting these adjustments, acted to the best of its ability to associate the adjustment with the sale on which the adjustment was made, rendering its reporting methodology not unreasonably distortive. See Final Results, 62 Fed. Reg. at 54,049. In evaluating the degree to which an allocation over scope and non-scope merchandise may be distortive, Commerce examines "the extent to which the out-of-scope merchandise included in the allocation pool is different from the in-scope merchandise in terms of value, physical characteristics, and the manner in which it is sold." Id. Torrington argues that Commerce's methodology is unlawful. Torrington is incorrect. Although the URAA does not compel Commerce's new policy on price adjustments, the statute does not prohibit Commerce's new practice.

Commerce's "change in policy . . . substitutes a rigid rule with a more reasonable method that nonetheless ensures that a respondent's information is reliable and verifiable." Timken, 16 F. Supp. 2d at 1108. Commerce's decision to accept SKF's and NTN's allocated adjustments to price is acceptable, "especially . . . in

light of the more lenient statutory instructions of [19 U.S.C. § ] 1677m(e)." Id. Accordingly, "Commerce's decision to accept the PSPAs . . . is fully in accordance with the post-URAA statutory language and directions of the SAA," and the decision to accept SKF's and FAG's adjustments was reasonable even though the adjustments were not reported on a transaction-specific basis and even though the allocations included rebates on non-scope merchandise. Id.

Torrington argues that the post-URAA statute retains the distinction between "direct" and "indirect" expenses and, therefore, does not permit Commerce to alter its treatment of adjustments to price. See Torrington's Mem. at 14. Torrington trivializes the statutory changes that prompted Commerce to reevaluate its treatment of adjustments and consequently revise its regulations. Because Commerce now treats PSPAs as adjustments to price rather than selling expenses, the distinction between direct versus indirect selling expenses is no longer relevant for the purpose of determining the validity of allocated price adjustments. One of the goals of Congress in passing the URAA was to liberalize certain reporting requirements imposed on respondents in antidumping reviews. Such intent is evident both in the amendments enacted by the URAA and in the SAA. The URAA amended the antidumping law to include a new subsection, 19 U.S.C. § 1677m(e).

The provision states that:

> In reaching a determination under [19 U.S.C.] section 1671b, 1671d, 1673b, 1673d, 1675, or 1675b . . . the administering authority and the Commission shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority or the Commission, if—-
> (1) the information is submitted by the deadline established for its submission,
> (2) the information can be verified,
> (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
> (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and
> (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e). This section of the statute liberalized Commerce's general acceptance of data submitted by respondents in antidumping proceedings by directing Commerce not to reject data submissions once Commerce concludes that the specified criteria are satisfied.[8]

---

[8] Consistent with § 1677m(e), the SAA states that "[t]he Administration does not intend to change Commerce's current practice, sustained by the courts, of allowing companies to allocate these expenses when transaction-specific reporting is not feasible, provided that the allocation method used does not cause inaccuracies or distortions." SAA at 823-24. Therefore, the statute and the accompanying SAA both support Commerce's use of allocations in circumstances such as those present here.

Next, Torrington suggests that Commerce has accepted the adjustments without requiring respondents to carry the burden of proving that the adjustments are non-distortive. See Torrington's Mem. at 22.  This argument is without merit.  As a routine part of its antidumping practice, Commerce accepts a range of reporting methodologies and allocations adopted by respondents.  The mere acceptance of an adjustment as reported cannot be a sufficient ground for rejecting Commerce's decision.  It would be anomalous indeed to expect a respondent to provide Commerce, in addition to the information on the basis of which Commerce could conclude that the respondent's reporting methods are not distortive, with proof of the validity of Commerce's determination of that sort.  Such a scheme would effectively allow the respondent to bind Commerce, restricting Commerce's inherent power to investigate, examine and render a decision.

In determining whether SKF's and FAG's allocation over scope and non-scope merchandise was unreasonably distortive, Commerce reasonably has not required respondents to demonstrate the non-distortive nature of the allocation directly, for example, by compelling them to identify separately the adjustments on scope merchandise and compare them to the results of allocations over both scope and non-scope merchandise.  Such a burdensome exercise would defeat the entire purpose underlying the more flexible

reporting rules, by compelling the respondent to go through the enormous effort that the new rules were intended to obviate. Rather, Commerce has adopted criteria by which Commerce itself could determine whether an allocation over scope and non-scope merchandise was likely to cause unreasonable distortions.

In the case at hand, Commerce's determination with respect to SKF's rebates and billing adjustments was reasonable. Commerce premised its conclusion on its finding that transaction-specific reporting is not appropriate for the rebates due to their nature, that is, because they are granted on the basis of sales <u>by</u> the distributor/dealer rather than on sales <u>to</u> the distributor/dealer. <u>Final Results</u>, 62 Fed. Reg. at 54,041. Commerce also found that transaction-specific reporting was not feasible for the billing adjustment since it related to multiple invoices, products, or invoice lines. <u>See id.</u> at 54,042. For both adjustments, Commerce found that the allocation methodologies used were not distortive, and that SKF acted to the best of its ability in reporting the information inasmuch as more specific reporting was not feasible. <u>See id.</u> at 54,051-52.

Commerce also properly accepted FAG's home-market rebates. FAG's home-market rebates were granted on a customer-specific basis, and only on sales of the products that actually received

rebates.  See id. at 54,041.  Commerce also found that the method
was not unreasonably distortive.  See id.

   Torrington asserts that Commerce improperly determined that
SKF and FAG acted to the best of their ability in reporting
adjustments.   See Torrington's Mem. at 23-26.   Torrington's
assertion is without merit.  When respondents' adjustments were
granted over both scope and non-scope merchandise without reference
to any particular model or transaction, Commerce could not have
reasonably expected them to be recorded or reported to Commerce in
a manner more specific than that which was used.  It was equally
appropriate for Commerce to consider, as a part of its decision
whether respondents acted to the best of their ability in reporting
the adjustments, the volume of adjustments when deciding whether it
is feasible to report these adjustments on a more specific basis.
In light of the considerable size of their databases, Commerce
reasonably found that "given the extremely large volume of
transactions involved in these AFBs reviews[,] [i]t is
inappropriate to reject allocations that are not unreasonably
distortive in favor of facts otherwise available where a fully
cooperating respondent is unable to report the information in a
more specific manner." Final Results, 62 Fed. Reg. at 54,049.  The
large volume of data is precisely one of the factors that one would

expect Commerce to consider in deciding whether a respondent has acted to the best of its ability in reporting a given adjustment.

In sum, the Court finds that Commerce's decision to accept SKF's and FAG's reported home-market adjustments was supported by substantial evidence and was fully in accordance with the post-URAA statutory language and the SAA. The record demonstrates that the requirements of 19 U.S.C. § 1677m(e) were satisfied by the respondents in that: (1) the reported adjustments were submitted in a timely fashion, see 19 U.S.C. § 1677m(e)(1); (2) the information submitted can be verified by Commerce, see 19 U.S.C. § 1677m(e)(2); (3) the respondents' information was not so incomplete that it could not serve as a basis for reaching a determination, see 19 U.S.C. § 1677m(e)(3); (4) respondents demonstrated that they acted to the best of their abilities in providing the information and meeting Commerce's new reporting requirements, see § 1677m(e)(4); and (5) there was no indication that the information was incapable of being used without undue difficulties. See § 1677m(e)(5).

Commerce's determinations with respect to SKF and FAG were also consistent with the SAA. The Court agrees with Commerce's finding in the Final Results that given the extremely large volume of transactions, the level of detail contained in normal accounting records, and time constraints imposed by the statute, the reporting and allocation methodologies were reasonable. This is

consistent with the SAA directive under § 1677m(e), which provides
that Commerce "may take into account the circumstances of the
party, including (but not limited to) the party's size, its
accounting systems, and computer capabilities." SAA at 865. Thus,
the Court finds that Commerce properly considered the ability of
SKF and FAG to report its billing adjustments on a more specific
basis. Accordingly, the Court concludes that Commerce's acceptance
of SKF's and FAG's reported adjustments was supported by
substantial evidence and fully in accordance with law.

**CONCLUSION**

This case is remanded to Commerce to: (1) annul all findings and conclusions made pursuant to the duty-absorption inquiry conducted for the subject review in accordance with this opinion; (2) attempt to match United States sales to similar home-market sales before resorting to CV; (3) reconsider its determination to deny a downward billing adjustment to INA on its home-market sales; (4) clarify how it complied with the statutory framework of 19 U.S.C. §§ 1677e, 1677m for using facts available and applying an adverse inference and if it determines it did not adhere to all of the statutory prerequisite conditions, to give INA the opportunity to remedy or explain any deficiency regarding its alleged sample sales; and (5) include all expenses included in "total United States expenses" in the calculation of "total expenses" for INA.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:     June 22, 2001
           New York, New York